in addition. the cost of raising the boat, and of putting her on the ways to be examined, after she was raised.

[Cited in The Mary Eveline, Case No. 9.211; The Havelah, 50 Fed. 334.]

[These were two libels against the steamship Nebraska, one by owner of canal boat Sarah Ball and the other by owner of cargo on board the same, to recover damages for a collision. At the first hearing of the case, the actions being tried together, a decree was rendered for the libellants. An order of reference was made as to the amount of damages. Case No. 10,075. The case is now heard upon exceptions to the commissioners' report as to the amount of damages allowed to the owners of the Sarah Ball.]

Benedict & Benedict, for libellant.

Owen, Nash & Gray, for claimants.

BENEDICT, District Judge. This case comes before the court upon exceptions to the commissioner's report of the amount of damages sustained by the libellant, by reason of the sinking of his canal boat, the "Sarah Ball," in the collision with the Nebraska.

The boat when sunk was lying at the end of a pier in the harbor of New York, and had on board a cargo of coal. Where the vessel sunk the water was about 30 feet deep, and it was not possible to ascertain the extent of her injuries as she lay upon the bottom, but it was manifestly possible to raise her. A contract was accordingly made with a wrecking company to raise her for $500, and she was thereupon raised and placed upon ways and examined. She was then found to be so much injured that the cost of repairing would exceed her value when repaired, whereupon she was sold at auction for $100.

The commissioner allowed the value of the vessel previous to the collision, (as a total loss,) less the proceeds of her sale, and in addition the expenses of raising her and placing her upon the ways.

To this report the only serious objection taken relates to the allowance of the expenses of raising the vessel. and placing her upon the ways, and it is insisted, on the part of the claimant, that the raising of the vessel was at the risk of the party incurring the expense, and was not chargeable against the wrong doer, in addition to the value of the vessel, it having turned out that the vessel was not worth raising. In support of this position, the case of the Metropolis, decided by Judge Betts and affirmed by Mr. Justice Nelson, and also by the supreme court, is relied on as an authority.

The law laid down in the case of the Metropolis [Banks v. The Metropolis, Case No. 962], I do not conceive to be applicable in the present case. In the case of the Metropolis, the vessel was sunk in the middle of the Sound, some sixteen miles wide, and there was no reasonable ground for

supposing that efforts to raise her would be attended with success. Here the vessel was sunk at a pier, where it was known that she could be raised at an expense of $500; and when, until she was raised, it was impossible to ascertain whether it would be expedient to repair her or not. Under such circumstances, it seems to me that it was incumbent upon a prudent owner to have the vessel raised. The raising was a necessary proceeding to enable the libellant to determine his course as to her repairs, and to compute his loss, and he is entitled to be repaid the reasonable expense thereby incurred. Such was the ruling in the case of The Engineer, 1 Lush. 138.

Furthermore, this vessel was sunk at a pier where she was an obstruction to the harbor of New York. She could not lawfully be permitted to remain where she was, and, if not raised by the libellant, might be removed by the commissioners of pilots at the expense of the libellant. Laws N. Y. 1860, c. 522, § 1.

The libellant was, therefore, bound to raise her, and the expenses, to which he was put, became a part of the damages caused by the collision. The allowance of the expense of raising seems to me, therefore, to be correct. As to the expense of the ways, I am also of the opinion that it was a necessary expenditure, to enable the libellant to examine his vessel, in order to determine his course as to repairs, and it is, therefore, properly allowed.

The report must be confirmed.

---

## Case No. 10,077.

### NEBRASKA v. POLLOCK.

[This is a state case. See 23 Int. Rev. Rec. 297.]

---

## Case No. 10,078.

### The NED.

[1 Blatchf. Pr. Cas. 119.] [1]

District Court, S. D. New York. March, 1862.

PRIZE—ENEMY'S PROPERTY—ACT JULY 13, 1861—CONSTITUTIONALITY.

Part of vessel condemned. under the sixth section of the act of July 13, 1861 (12 Stat. 257), as belonging to a citizen of the state in insurrection. That act is constitutional.

In admiralty.

BETTS, District Judge. The libel of information charges that the collector of this port seized the schooner Ned, her tackle, &c., as forfeited to the United States under the provisions of the act of July 13, 1861, section 6, as belonging, in whole or in part, to citizens of the United States in a state of insurrection. The libel was filed September 7, 1861. An amended libel, detailing more specifically the grounds of forfeiture, and alleging the vessel

---

[1] [Reported by Samuel Blatchford, Esq.]

to be the property of Ely Murray, of Wilmington, North Carolina, was filed November 12, 1861.

Elzey S. Powell intervened, September 9, 1861, by sworn claim and answer, for himself, Ely Murray and others, to the original libel, avowing that the persons named and others were in possession of the vessel at the time of the attachment thereof, and that they alone are the true and bona fide owners of the schooner. No further answer was interposed to the amended libel specifically, but all the claimants named in the former claim, of the fifth of November, 1861, filed extended answers and pleas, embodying six specific exceptions, amounting to special demurrer, and also to a general issue to the libel. The after-proceedings in the suit before this court imply that the merits of the case are submitted for decision on the pleadings, with the addition of the exemplification of the register of the vessel offered in evidence by the district attorney. There is a technical incongruity between the language of the amended libel and the exceptions and demurrers, because, from the dates of their presentations to the court the defensive allegations seem to precede the presentation of the information demanding the forfeiture of the property. This was all well known to the counsel for both parties on the argument of the cause and the submission of the points in controversy to the consideration of the court.

Accepting the pleadings as taking effect in their due order, and that the libellants proceed for the forfeiture of the interest of Ely Murray, and remit all demands of condemnation against the interests of other part owners, it appears, from the pleadings and the certified copy of the registry found on board the vessel—

1. That at the time of her seizure she was in possession of Ely Murray and his co-claimants, as owners thereof.

2. It is alleged that she was owned in North Carolina, and that Murray was a resident of that state.

3. The information sets forth as facts all the particulars necessary to bring her within the provisions of the act of July 13, 1861.

4. The act itself, and the public acts of the government in relation to the existing Rebellion within the United States, afford judicial notice that the matter comes within the purview of that statute.

5. In the opinion of the court, the act, if valid in law, authorizes and calls for the condemnation and forfeiture of the interest of the rebel owners in the vessel, unless the statutory provisions are in violation of the constitution.

6. This court, in the case of Mary McRae, held this enactment to be within the legislative competency of congress, and enforced its provisions.

It is ordered that the exceptions to the suit be disallowed and overruled, and that the judgment be entered in favor of the libellants, forfeiting one-fourth part of the said vessel and her tackle to the United States.

The attorney of the United States having discontinued and remitted all claims in this suit for three-fourths of the value of the vessel and tackle, as belonging to loyal citizens of the United States, such amount of the proceeds is ordered to be restored to the claimants thereof.

---

## Case No. 10,079.

### NEEDERER v. BARBER.

[2 Betts, C. C. MS. 38.]

Circuit Court, S. D. New York. May 25, 1843.

BILLS AND NOTES — FOREIGN EXCHANGE — SUFFICIENCY OF PROTEST — NOTICE — ACCEPTANCE — STRIKING OUT SUBSEQUENT INDORSEMENTS.

[1. The protest of a foreign bill is sufficient if made in conformity to the law of the place where the dishonor occurred.]

[2. Where the drawer of a bill, after it is drawn, gives the drawee notice not to pay it, presentation for acceptance and payment is waived.]

[3. A payee or indorsee of a bill in possession has a right to strike out subsequent indorsements, and recover against the drawee upon the special count, or give such bill in evidence under the money counts.]

[This was an action by John Neederer against Andrew Barber on a foreign bill of exchange.]

BETTS, District Judge. The declaration is on a foreign bill of exchange, by the payee against the drawer. A verdict was taken for the plaintiff subject to the opinion of the court, on the questions of law arising upon the facts in evidence. The defendant, after the bill was drawn, gave orders to the drawees not to pay it, and it was protested for non-acceptance at Metz in France, by a huissier, in the presence of two witnesses. Two points were taken upon the sufficiency of the protest: (1) That it must be made by a notary public; (2) that to render the protest by a huissier sufficient the laws of France must be proved authorizing that officer to make the protest. The protest of foreign bills is sufficiently proved if made in conformity to the law of the place where the dishonor of the bill occurs. All the writers of authority on the subject concur in this general doctrine (Chit. Bills, Ed. 1833, pp. 362–490; Story, Bills, § 276, note 2), and by the laws of France the officer employed in this case was competent to make the protest (Code of Commerce, Art. 173), if the court can regard that law, without its being proved as a fact before them (3 Wend. 173). The court does not intend to intimate any opinion that the French law may not be received in evidence in commercial questions, as the English is by the books supplying that proof in their own courts. The question of the sufficiency of the protest does not become material in this case, because the drawer by his own act excused the payee from the necessity of pre-